### PENNSYLVANIA R. CO. v. SWIFT & CO.

(District Court, E. D. Pennsylvania. February 13, 1918.)

#### No. 3822.

CARRIERS ⬅211—INTERSTATE CARRIAGE OF LIVE STOCK—TWENTY-EIGHT HOUR LAW—PROPER FEEDING.

Under Act June 29, 1906, c. 3594, §§ 2, 3, 34 Stat. 608 (Comp. St. 1916, §§ 8652, 8653), which require railroad carriers of live stock to unload the same into pens for rest at least once in each 28 hours, and unless provision is made therefor by the shipper, to properly feed and water such stock during the rest period, under penalty, and giving them a lien for the reasonable expense thus incurred, a railroad held entitled in such case to recover for 250 pounds of hay prepared in advance and furnished to each carload of a shipment of cattle, although a quantity of hay amounting to 150 to 200 pounds, was placed in the racks in each car by the shipper when the shipment was made, the statutory obligation of the carrier being to feed during the period of rest, and it being the opinion of the Department of Agriculture, stated in a circular issued for the information of carriers, that 250 pounds per car is a proper allowance.

At Law. Action by the Pennsylvania Railroad Company against Swift & Co. On motion by defendant for new trial. Discharged.

See, also, 242 Fed. 92.

John Hampton Barnes, of Philadelphia, Pa., for plaintiff.

R. D. Rynder, of Chicago, Ill., and M. Hampton Todd, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. The plaintiff's action was based upon the provisions of the act of Congress approved June 29, 1906. The pertinent provision is that which gives the right to a railroad com-

pany to collect the reasonable expense incurred in the feeding of live stock required by the act to be fed by the railroad carrier. The denial of liability by the defendant grows out of certain fact features of the feeding out of which the demand has grown. One which may be deemed the moving feature is that the defendants at the time the cattle were shipped placed them in cars which were provided with racks in which from 150 to 200 pounds of hay had been placed to sustain the cattle, or help sustain them during the journey, which was expected to occupy something more than 24 hours.

The secondary fact, or the fact upon which what may be termed the secondary defense, or the second line of defense, is based, is this: The cattle were unloaded at Pittsburgh and received there in a stockyard. In order. to facilitate the transportation of the cattle, or of their feeding, in order to speed their final delivery at their destination, the practice had grown up, with the concurrence of all parties concerned, including the shippers, that in preparation for the arrival of the cattle 150 pounds of hay should be placed in the racks of the pens in the stockyard into which the cattle were received after unloading, and 100 pounds of hay should be placed in the cars from which they had been unloaded and into which they were reloaded. This was upon the basis of the cattle requiring 250 pounds of hay for each carload.

The Department of Agriculture, in response to, or in anticipation of, a request from the railroad carriers of the quantity of feed ·which the carriers might properly feed the cattle thus unloaded, put out a circular in which the opinion was expressed that proper feeding of cattle called for the issue to them of 250 pounds of hay during every 24 hours. The soundness of the opinion thus expressed is confirmed by all the evidence in the case, including that offered on behalf of the defendants. There was no controversy over this in the case, and a virtual admission on all sides that what may be called the government requirement was the minimum quantity which could be considered as constituting a proper feeding. The opinion thus expressed by the Department, however, did not take into consideration the fact, which as applied to the shipments in question was an uncontroverted fact, that the cattle which were fed by the carrier were not cattle which had fasted for 24 hours; but cattle which within a period of from something more than 24 hours up to a maximum of 28 hours, or at the most 36 hours, had all been fed from 150 to 200 pounds.

The shippers were therefore disposed to take issue with the railroad carrier, and through them with the Department of Agriculture, not over the opinion that cattle which had not been fed should properly be fed 250 pounds, but over the proposition that cattle which had already been fed from 150 to 200 pounds of hay would require over 100 pounds additional. In consequence, the shippers asserted that, in view of the fact above stated, 100 pounds, and not 250 pounds, constituted a proper feeding within the meaning of this act of Congress at .the place at which and the time when the cattle were unloaded. The shippers in further consequence notified the railroad to limit the feeding at the ·relay stations to 100 pounds. With this demand the

defendants did not feel justified in complying, and continued the practice of feeding 250 pounds, in the manner above stated. To raise the question suggested, the shippers paid the railroad company for 100 pounds, refusing to pay for the additional 150 pounds. This action was then brought as a test case.

What may be termed the two main thoughts presented by the defense are these:

(1) The act of Congress has as its purpose to save the cattle from suffering. What is proper feeding within the meaning of the statute must be determined in the light of the facts. If the fact had been that the cattle had not been fed for 24 hours, the propriety of a feeding of 250 pounds would not have been questioned. Inasmuch, however, as they had already been fed 150 or 200 pounds, the propriety of feeding more than 100 pounds additional is questioned. What is proper feeding must therefore be determined in the presence of the fact of this prior feeding.

If we were dealing only with the question of a proper feeding, the proposition upon which this part of the defense rests must be accepted. We are not dealing, however, with this question, but the narrower and more technical question of the feeding which is required by the statute. We assume Congress to have legislated within its powers. The requirement of the statute is that cattle in transit must be unloaded, rested, watered, and fed within every 24-hour period of their transportation in cars. This requirement must be met, and it is not met by any substitute provision for feeding in transit. The requirement of the statute is not limited to cattle which have been confined in cars without feed, but to all cattle which have been in transit for more than 28 hours. What may be termed the administrative reasons for the requirement as written are obvious. Congress, it is true, did not dictate, as is well pointed out by defendants, specifically what weight or quantity of feed should be given. The carrier is, however, required to feed, and to properly feed. The reasonable expense thus incurred it may recover. The thought is not lost sight of that the obligation which rests upon the shipper is an imposed obligation, and is limited to the command of the statute. The other command, however, to feed, rests with its full weight upon the carrier. It must feed, and is given the right to be reimbursed "the reasonable expense" thus incurred.

The thought expressed in the charge is that if, in the performance of this imperative duty, the carrier does not incur an expense beyond that which a reasonably good judgment would approve as, under all the facts and circumstances, the outlay which proper feeding demanded, it may enforce its right to reimbursement. To this view, we adhere. There is no denial by the defendants of the thought that the statute must permit of a practical working rule in its application. Such a rule should have sufficient elasticity, to allow, not only for feeding, but also for provision for feeding. They do not criticize the practice, in which they acquiesced, of preparing in advance for the feeding by having feed placed in the stockyard racks, nor of the transportation of the cattle being facilitated by feed being placed in the cars.

Their own practice of placing feed in the cars is, in their view, wholly in line with the practice followed by the carrier.

The real defense is founded upon the claim of equality of treatment. They take their stand upon the aphorism that what is "fish for one should not be made flesh for another." They view the obligations as the same, and demand a corresponding likeness in the applications. The obligations, however, are not the same, or rather the question which arises is not quite the same. If it successfully argued, for illustration, that the command of Congress is that the feeding shall be during the rest hours, and that in consequence a feeding outside of these hours (either before or after) is not a compliance with the statute, the proper application of this principle is in a case in which the carrier is charged with the penalty for noncompliance. The principle does not have the same exact application to a case between the carrier and the shipper. A carrier, for further illustration, who had disembarked the cattle, rested them for the 5 hours, and watered them, might be liable to an imposition of the penalty because it had not fed them, or because, although it had fed, it had not properly fed, them. Certainly, in the latter case, the shipper could not defend an action against him by the carrier. There must be a somewhat different principle which controls as between the carrier and the shipper than that which controls between the United States and the carrier. The controlling principle applied in the former case is that which we have already formulated. It is that, when the carrier has performed the duty of feeding, it has the right to recover the "reasonable expense" thereby incurred, and if it has exercised a reasonable judgment in determining what is fed in the kind and quantity of feed supplied, this determines the question of a proper feeding.

Here again, of course, what is proper feeding is to be determined under all the facts and circumstances as before. The defendants have, in consequence, no just ground of complaint that they have not been given the benefit of the application of the same principle in the cases of feed put into the cars by them, and in the case of feed put into the cars by the carrier. So far as the cases are alike, the same principle has been applied. Back of the whole discussion is this basic fact. The shippers are by the act of Congress protected in their right to feed their own cattle. If they assert this right by feeding the cattle, the carrier is not called upon to feed, because the latter is required to feed only in case of the default of the owners of the cattle. The whole defense, so far as it has merit, is seen upon analysis to rest upon the unstable foundation of the assertion of a right in the shipper to refuse to feed, and yet reserve to themselves to dictate in what manner the duty shall be performed by the carrier. They have no such right.

The only remaining complaint is the admission in evidence of the Department circular. This was one fact among the facts and circumstances in the light of which the determination of what was a proper feeding was to be determined. They asked to have, and were allowed to have, go in evidence their own demand that 100 pounds was a proper food supply. The Department demand of 250 pounds stands

on the same support. The probative effect of each was limited to that of each being an exression of opinion which entered into the circumstances and made up the atmosphere in which the carrier made up its own judgment and through which what was done was to be viewed in order to be judged.

The motion for a new trial is discharged, and plaintiff has leave to enter judgment on the verdict.